NOTICE
Decision filed 03/17/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230654-U

NO. 5-23-0654

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 22-CF-524 |
| | ) | |
| ISAIAH D. JENKINS, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction for unlawful possession of a weapon by a felon because the defendant was not prejudiced by defense counsel's stipulation to the term "forcible felony."

¶ 2    The defendant, Isaiah D. Jenkins, appeals his conviction following a jury trial in the circuit court of Champaign County, Illinois. For the following reasons, we affirm.

¶ 3                             I. BACKGROUND

¶ 4    We present only the facts necessary to our disposition of this appeal. On April 28, 2022, the defendant was arrested after fleeing from a lawful traffic stop, during which police officers found a Bryco Arms Jennings semiautomatic pistol in the driver's side interior door panel.

¶ 5    On April 29, 2022, the defendant was charged by information with four counts. Count I alleged that on April 28, 2022, the defendant committed the offense of unlawful possession of a

1

weapon by a felon, in that he knowingly possessed a firearm, a Bryco Arms Jennings semiautomatic pistol, and had been previously convicted of a forcible felony offense, robbery, in Gwinnett County, Georgia, cause No. 13-B-03289-7. Count II[1] alleged that on April 28, 2022, the defendant committed the offense of possession of a stolen firearm, in that he, a person not entitled to possession of a firearm, possessed a firearm, a Bryco Arms Jennings semiautomatic pistol, knowing it to have been stolen. Count III alleged that on April 28, 2022, the defendant committed the offense of defacing identification marks of firearms, in that he knowingly possessed a firearm, a Bryco Arms Jennings semiautomatic pistol, upon which the manufacturer's serial number had been changed, altered, removed, or obliterated. Lastly, count IV alleged that on April 28, 2022, the defendant committed the offense of obstructing a peace officer, in that he knowingly obstructed Lieutenant Mark Holley in the performance of his duties by fleeing from a traffic stop.

¶ 6    The defendant's case was set for trial on May 9, 2023. Before *voir dire*, the parties notified the trial court that they agreed to stipulate, pursuant to *Old Chief v. United States*, 519 U.S. 172 (1997), that the defendant had been previously convicted of a prior forcible felony.

¶ 7    The following colloquy occurred:

"[THE STATE]: I'm handing the Court what's been marked as People's Exhibit 1, which is a certified record of conviction. And I'm also handing the Court what's—the People's stipulation with the defense. Paragraph 1 is what we would anticipate being presented to the jury.

THE COURT: Okay.

---

[1]On May 9, 2023, the State dismissed count II.

2

[THE STATE]: I have talked to [defense counsel] about this. There is language in the stipulation that People's exhibit 1 is an accurate record of that conviction. We'd ask that that not be read to the jury since that would only invite them to want to see the exhibit.

THE COURT: Okay.

[THE STATE]: But it would still be part of the stipulation for purposes of trial.

[DEFENSE COUNSEL]: Yes, Your Honor. I agree with that.

THE COURT: Okay. So I would only read—of paragraph 1, I would only read to the jury, 'Defendant was convicted of a forcible felony in Gwinnett County, Georgia, on April 24th, 2014?'

[THE STATE]: Yes, Your Honor.

THE COURT: And then paragraphs 2 through 9 would all be read?

[DEFENSE COUNSEL]: Yes, Your Honor."

Following the resolution of other pretrial matters, *voir dire* was conducted. After the *voir dire* process was concluded, the jury was impaneled and the parties delivered opening statements.

¶ 8     In its opening statement, the State noted, in pertinent part, that the "[d]efendant is a convicted felon, a forcible felon, and he's not allowed to possess a firearm." Additionally, the State informed the jury that the issue at trial was "not about whether the defendant could legally possess a firearm." Rather, the issue at trial was "whether the [d]efendant knew that the [firearm] was in his car." In her opening statement, defense counsel agreed with the State, acknowledging that the State was "basically correct." She urged the jury to carefully consider the evidence presented and draw upon their own experiences to determine whether the defendant knowingly possessed the firearm found in his vehicle.

3

¶ 9   The State called Jerry Jones (Jerry) as its first witness. Jerry testified that he currently resides in Tuscola, Illinois, with his wife and three grandchildren. Jerry testified that in March or April of 2022, he owned a white Nissan, which he used on occasion, while his grandson, Jakob Jones (Jakob), primarily drove the vehicle. Jerry testified that Jakob sold the vehicle in poor condition. However, according to Jerry's testimony, the vehicle's armrest never came off or had been loose during his ownership. Additionally, Jerry testified that he was unaware if there was a means to access the interior of the vehicle's driver side door when it was sold.

¶ 10   The State then introduced a series of photographs, People's Exhibit Nos. 8 and 9. First, the State showed Jerry People's Exhibit No. 8. Jerry testified that he recognized the vehicle depicted in People's Exhibit No. 8 and identified the vehicle as the white Nissan. Jerry testified that People's Exhibit No. 8 depicted what appeared to be "an opening on the [driver's side] door handle" that was not present at the time the vehicle was sold. Next, the State showed Jerry People's Exhibit No. 9. Jerry identified People's Exhibit No. 9 as a photograph of a firearm. Jerry testified that the State had shown him People's Exhibit No. 9 before his testimony. Jerry stated that, prior to being shown the exhibit, he had never seen the firearm depicted in the photograph before. Furthermore, Jerry testified that he had never possessed a firearm. Nor had he seen his grandson, Jakob, or any of his other grandchildren with a firearm.

¶ 11   During cross-examination, Jerry testified that other individuals, who were 16 and 17 at the time, had access to the vehicle. Additionally, Jerry confirmed that Jakob sold the vehicle. Furthermore, Jerry testified that he did not frequently drive the vehicle and only used it when his pickup truck was under maintenance.

¶ 12   On redirect examination, Jerry testified that he believed the vehicle was titled under the name Isaiah Jenkins at the time of sale.

4

¶ 13    The State then called Jakob to testify. Jakob testified he currently resides with his grandfather, Jerry, in Tuscola, Illinois. Jakob testified that he has been employed at FedEx in Champaign for over a year and a half, and at one point, worked with an individual named Dean. Jakob identified the defendant as the individual named Dean in open court.

¶ 14    Jakob testified that he worked with the defendant for about four months. During that time, Jakob testified that he drove the white Nissan semi-regularly. Additionally, Jakob testified that his grandfather, Jerry, authorized him to sell the vehicle, which he then sold to the defendant. At the time of its sale, Jakob testified that he was familiar with the vehicle's condition. He described it as "not in great condition," but testified that the driver's side armrest was secure. Additionally, Jakob testified that he was unaware of any issues with the vehicle's driver side door at the time of the sale and did not know if there was a way to access the interior of the driver's side door.

¶ 15    The State then presented Jakob with People's Exhibit No. 8. Jakob testified that People's Exhibit No. 8 appeared to be a photograph of a car door. Jakob testified that he recognized the vehicle depicted in People's Exhibit No. 8 and identified it as the white Nissan. However, Jakob testified that People's Exhibit No. 8 did not accurately represent the vehicle's appearance at the time of its sale. Specifically, he testified that the interior door handle cover was missing. Furthermore, Jakob testified that he was unaware of a way to easily remove the vehicle's interior door panel at the time of the sale.

¶ 16    The State then asked Jakob to confirm whether he was the only person with access to the vehicle. Jakob testified that he, along with his grandmother and grandfather, Jerry, had access to the vehicle. He explained that the vehicle was an additional car kept for family use and that all the family members, except for his brother, used it occasionally. Jakob further testified that neither he nor his grandmother nor grandfather, Jerry, possessed a firearm.

5

¶ 17    The State then presented Jakob with People's Exhibit No. 9. Jakob identified People's Exhibit No. 9 as a photograph of a firearm. Jakob testified that the State had shown him People's Exhibit No. 9 before his testimony. He stated that, prior to being shown the exhibit, he had never seen the firearm depicted in the photograph before.

¶ 18    On cross-examination, Jakob's testimony confirmed that the vehicle was an extra car kept for family use. Additionally, Jakob's testimony on cross-examination confirmed that his brother did not drive the vehicle. Furthermore, Jakob testified that his brother worked at FedEx at the time of the vehicle's sale and had been in the vehicle.

¶ 19    On redirect examination, Jakob testified that on the day of sale, he drove the vehicle to FedEx. He could not recall if he made his brother come with him or drive separately to ensure that he would have a ride home. However, Jakob testified that his brother was not in the vehicle the day it was sold. Also on cross-examination, Jakob confirmed that the armrest of the vehicle was secure on the day it was sold. Additionally, he testified that he transferred the title of the vehicle to the defendant at the time of the sale. Jakob explained that he could not recall the name he was given to transfer the title to; however, he testified that he could recall the last name being Jenkins.

¶ 20    The next witness to testify was Lieutenant Mark Holley of the Illinois State Police. Holley testified that on April 28, 2022, he was patrolling in his unmarked squad car near Bradley Avenue, in Champaign, Illinois, when he observed the driver of a white Nissan with a phone in his hands. Holley testified that he initiated a traffic stop, and the vehicle pulled over on the left side of "Bradley Avenue, just west of McKinley." After stopping directly behind the vehicle, Holley exited his squad car and approached the passenger side of the vehicle. In open court, Holley identified the defendant as the driver.

¶ 21    Holley testified that he observed some "pretty normal behavior" from the defendant when he first made contact with him. While speaking to the defendant, Holley noticed the odor of raw cannabis emanating from the vehicle. Additionally, Holley testified that he observed cannabis debris in the door handle of the front passenger side door. Holley testified that he brought the cannabis debris to the defendant's attention, at which point the defendant identified the cannabis debris as stems. After obtaining the defendant's license, Holley testified that he then asked the defendant to pull into an adjacent parking lot for safety purposes. Holley testified that "[the defendant] was very compliant. Everything pretty kosher."

¶ 22    Once parked, Holley testified that he approached the vehicle, again, from the driver's side and asked the defendant to exit the vehicle in order to conduct a probable cause search. At that moment, Holley testified that he observed a change in the defendant's behavior, describing it as "a little apprehensive." Holley testified that the defendant then asked Holley if there was a problem. Holley responded affirmatively, indicating that there was cannabis in plain view.

¶ 23    While the defendant was exiting the vehicle, Holley testified that he observed a large hunter's knife in the map sleeve of the driver's side door. Holley testified that the defendant claimed the knife was for his protection, stating that he had been shot before and did not want to be shot again. Holley testified that, given the circumstances, it was illogical for the defendant to possess such a large but lawful hunting knife, because "you don't bring a knife to a gun fight." Additionally, Holley noted the defendant's behavior change, describing the defendant as nervous.

¶ 24    Holley testified that he then directed the defendant to sit in the front passenger seat of his squad car. As the defendant approached his squad car, the defendant slightly turned his head back and asked Holley if he was going to search his vehicle. Holley responded, "yes," which prompted

the defendant to flee on foot. Holley testified that he then informed dispatch of the defendant's direction of travel and proceeded to search the defendant's vehicle.

¶ 25     While searching the vehicle, Holley noticed that the driver's side armrest looked loose or messed with. Holley then removed the armrest and found a 9-millimeter semiautomatic pistol. According to Holley's testimony, the firearm was then removed from the vehicle and securely placed in the back of his squad car.[2]

¶ 26     The State then showed Holley People's Exhibit Nos. 8 and 9. Holley identified People's Exhibit No. 8 as "the driver's side door of the Nissan that I stopped." Next, Holley identified People's Exhibit No. 9 as the firearm retrieved from the defendant's driver side door. The exhibits were admitted into evidence without objection. The State then introduced People's Exhibit No. 2. Holley identified People's Exhibit No. 2 as "the Bryco Jennings nine-millimeter pistol that [he] recovered on April 28th." People's Exhibit No. 2 was admitted into evidence without objection.

¶ 27     The State also introduced and published People's Exhibit Nos. 3 and 4, both of which were identified by Holley as aerial maps depicting the north and south portions of Bradley Avenue. Holley's testimony demonstrated that the aerial locations depicted where the defendant was pulled over, pursued, and arrested. People's Exhibit Nos. 3 and 4 were admitted into evidence without objection.

¶ 28     On cross-examination, Holley testified that the defendant's behavior began to change when he informed the defendant that cannabis debris was in plain view. Holley testified that when the defendant exited the vehicle, he noticed a knife in the car. Holley confirmed that owning a knife

_____

[2]The parties stipulated that Holley recovered the firearm from the vehicle on April 28, 2022, and securely transported the firearm to a secure location. The firearm remained there until investigators examined it and collected DNA samples. The firearm and the samples were maintained in a sealed condition, undisturbed and in the same state they were when collected, until they were subject to forensic testing. Forensic testing concluded that the samples taken from the firearm contained no human DNA.

8

was not illegal. Further, Holley testified that the defendant's apprehension seemed to grow upon exiting the vehicle. Holley described the defendant as "a little bit edgy."

¶ 29 Arresting officer, John Copple, of the Illinois State Police testified regarding his involvement with the search for and eventual apprehension of the defendant. Copple testified that he, along with 8 to 12 other officers, responded to Holley's dispatch. Copple testified that he was able to apprehend the defendant within 45 minutes of the traffic stop. Before the defendant's apprehension, Copple observed the defendant "sprinting between two residences" adjacent to the Kraft Heinze Company, located on Bradley Avenue. After Copple's testimony, the trial court admonished the jury regarding stipulations by stating: "You should consider the stipulations of the parties in the same manner as you consider any other evidence presented in this case. In this case, the parties hereby stipulate as follows: The [d]efendant was convicted of a forcible felony in Gwinnett County, Georgia, on April 24, 2014."

¶ 30 After the trial court read the stipulation of the parties, it excused the jury for lunch. The defendant then moved for a directed verdict, arguing that the evidence presented did not establish his guilt beyond a reasonable doubt. The State responded that the only significant issue in the case was whether the defendant knowingly possessed a firearm. The State argued that the evidence circumstantially demonstrated intent. The trial court denied the defendant's motion. Thereafter, the defendant informed the trial court that he did not intend to testify.

¶ 31 Following the lunch break, the State rested, and defense counsel called the defendant's fiancée, Hollee Lenoir, to testify. Lenoir testified that the defendant is commonly known by the nickname "Dean," which he uses to introduce himself because his father named him Dean. However, his mother named him Isaiah, and that name appears on his birth certificate.

9

¶ 32    Lenoir recalled that the white Nissan was purchased in March of 2022. At the time of the purchase, Lenoir testified that the vehicle appeared to be in perfect condition, although it sounded horrible. Regarding the interior, Lenoir testified that "the interior was in good condition, but it was just dirty." As a result, the interior of the vehicle was cleaned on the day of its purchase.

¶ 33    Lenoir testified that she occasionally drove the vehicle. She testified that she did "not necessarily" notice any issues with the driver's side car door. However, she testified that the driver's side door would produce "a pop noise, like a pop back noise" when weight was applied to it. The passenger side door made the same noise. Lenoir attributed these sounds to the fact that the vehicle was used. Despite this, Lenoir testified that she did not investigate the driver's side door further, as the noises did not seem suspicious to her. Lenoir also testified that the driver's side armrest did not move, and there were no signs that the armrest had been tampered with.

¶ 34    On cross-examination, Lenoir testified that she remembered being a passenger in the vehicle on the day of the defendant's arrest, as the defendant had dropped her off to work. Lenoir testified that she occasionally drove the vehicle and mentioned that she last drove it "within a week" of the defendant's arrest.

¶ 35    During redirect examination, Lenoir's testimony confirmed that she did not notice anything unusual with the armrest on the day of the defendant's arrest.

¶ 36    On recross-examination, when defense counsel asked Lenoir whether she thought the armrest was loose on the day of the defendant's arrest, Lenor testified, "[B]oth [armrests] were. They both made their noises." However, Lenoir testified that she had no idea if the armrest had ever been removed or if it could be removed easily, as she had never tried to take it off.

¶ 37    After Lenoir finished her testimony, the trial court took a brief recess to allow defense counsel to confer with the defendant regarding his decision to testify. Defense counsel also

10

discussed with a witness whether she would present rebuttal testimony. Once back on record, and still out of the jury's presence, defense counsel informed the trial court that she would rest her case, and that the defendant would not testify. Additionally, defense counsel indicated that she wished to renew her motion for a direct verdict at the close of the evidence. The trial court informed defense counsel that her renewal would be denied. In the presence of the jury, defense counsel officially rested, concluding the first day of the defendant's trial.

¶ 38    The second day of the defendant's trial began with a conference on jury instructions. The State tendered a modified version of Illinois Pattern Jury Instructions, Criminal, No. 18.07, which was labeled as People's Instruction No. 11. People's Instruction No. 11 stated: "A person commits the offense of unlawful possession of a weapon by a felon [(UPWF)] when he, having been previously convicted of a forcible felony knowingly possesses a firearm [*sic*]." Defense counsel did not object to People's Instruction No. 11. In addition, the State tendered a modified version of the Illinois Pattern Jury Instructions, Criminal, No. 18.08, which was labeled as People's Instruction No. 15. People's Instruction No. 15 stated:

"To sustain the charge of [UPWF], the State must prove the following propositions: First Proposition: That the defendant knowingly possessed a firearm, and Second Proposition: That the defendant had previously been convicted of a forcible felony. If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty. If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty."

Defense counsel did not object to People's Instruction No. 15. Following a brief recess, the trial court brought the jury into the courtroom for closing arguments.

11

¶ 39    During its closing arguments, the State explained that the central issue at trial was "whether the Defendant knowingly possessed [a firearm]." Additionally, the State discussed the evidence and discussed jury instructions. In particular, the State read People's Instruction No. 15. to the jury:

> "Now, let's look at those propositions for the [UPWF] charge. First proposition: That the [d]efendant knowingly possessed a firearm; and second proposition: That he had previously been convicted of a forcible felony.
>
> Now, had he previously been convicted of a forcible felony? Yes. We know that. You received a stipulation that he was convicted of a forcible felony in Gwinnett County, Georgia, in 2014."

¶ 40    Then, the State argued the concepts of constructive possession and circumstantial evidence as those terms related to the firearm. Specifically, the State recited People's Instruction No. 15, and told the jury:

> "This pistol was placed next to the driver. It's—only one person had ready access to it. So if he knew the gun was there, yes, he did possess it even if it's not in his hand. What we're really arguing about is whether [the defendant] knowingly possessed [the firearm], whether he knew the gun was there."

The State also stressed that the defendant possessed the firearm because it was under the defendant's immediate control. Following a summary of the testimony presented at trial, the State asked the jury to find the defendant guilty.

¶ 41    In her closing arguments, defense counsel argued that the State failed to establish the defendant's guilt beyond a reasonable doubt due to the absence of DNA evidence linking the firearm to the defendant. Defense counsel argued that "somebody was trying to get rid of the gun

12

before the car was sold, wiped it down, and put it in [the vehicle], and then sold the car." Further, defense counsel noted the fact that the defendant owned the vehicle for approximately a month and emphasized the testimony from Lenoir. In asking the jury to find the defendant not guilty, defense counsel encouraged the jury to consider "all the circumstances that led up to [the] traffic stop, that led up to [the defendant's] fleeing."

¶ 42    In rebuttal, the State first recounted Jakob's testimony. In doing so, the State emphasized that although Jakob testified that others had access to the vehicle, Jakob also testified that the armrest was secure as of the date of its sale. Next, the State referenced Lenoir's testimony, noting that she did not drive the vehicle on the day of the defendant's arrest. The State argued, "[Lenoir] can't testify as to whether [the armrest] was loose that day. It was secure a few days before, suggesting, if [Lenoir] is telling the truth, that it was loosened in that intervening period, and the [d]efendant was the only other person to have access to it." The State then addressed defense counsel's argument concerning DNA evidence, asserting the jury had not been presented with sufficient evidence to support defense counsel's inferences. Lastly, regarding the issue of fleeing, the State pointed out that the defendant chose to flee after both the knife and cannabis were discovered. The State then suggested that the defendant fled because he feared Holley would find the firearm.

¶ 43    After the State presented its rebuttal, the trial court read the jury instructions that had been agreed upon by both parties and retired the jury to deliberate. The jury returned a guilty verdict on counts I, III, and IV.

¶ 44    On June 13, 2023, defense counsel filed a motion for acquittals or in the alternative a motion for new trial. On June 15, 2023, defense counsel filed an amended motion for acquittals or in the alternative a motion for new trial. On July 26, 2023, the trial court heard defense counsel's

13

motion, which was denied in part and granted in part.[3] That same day, the defendant was sentenced to 104 months in the Illinois Department of Corrections with credit for time served, court costs and statutory fees. On August 15, 2023, defense counsel filed a motion for reconsideration of sentence. On August 28, 2023, the motion was denied, and that same day the defendant filed his notice of appeal.[4] Additional facts will be provided as necessary below.

¶ 45                                    II. ANALYSIS

¶ 46     On appeal, the defendant raises the issue of whether the repeated assertions to the jury that the defendant had previously been convicted of a "forcible felony" prejudiced the defendant, where the parties erroneously believed that a prior "forcible felony" was an element of the offense of UPWF.[5] The defendant acknowledges that he forfeited the issue for the purposes of appeal but asks that we consider the issue under the second prong of the plain-error doctrine.

¶ 47     However, during oral arguments, the defendant's appellate counsel conceded that the matter was not subject to review. In particular, appellate counsel stated that there was precedent suggesting that second prong plain-error review does not offer grounds for excusing the defendant's forfeiture. As a result, the defendant has abandoned the argument. See *People v.*

---

[3]The trial court granted defense counsel's amended motion pursuant to *People v. Ramirez*, 2023 IL 128123, and vacated the defendant's conviction for possession of a defaced firearm.

[4]We note that the defendant's notice of appeal specifies the following orders being appealed: "conviction, sentence, and denial of motions for reconsideration of sentence." However, since the defendant does not address the issue of sentencing or the denial of the motions for reconsideration in his opening appellant brief, these matters are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

[5]As charged in this case, the offense of UPWF contains the following elements: (1) defendant knowingly possessed a weapon on or about his person, and (2) defendant had been convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2022). Thus, to prove a violation of section 24-1.1, the State must only establish the defendant's felon status. *People v. Walker*, 211 Ill. 2d 317, 37 (2004); see *People v. Webb*, 2018 IL App (3d) 160403, ¶ 17 (whether a prior conviction constitutes a forcible felony is a question of law); see also Illinois Pattern Jury Instructions, Criminal, No. 4.05, Committee Note (4th ed. 2000) (explaining that a jury instruction defining the term "forcible felony" is not necessary because determining whether an offense is a "forcible felony" is a question of law for the trial court rather than a question of fact).

*Taylor*, 2015 IL 117267, ¶ 20. Accordingly, we will limit our review to the alternative argument raised by the defendant on appeal.

¶ 48    In the alternative, the defendant maintains that defense counsel was ineffective. The defendant contends that we should conclude that defense counsel was ineffective for stipulating to the use of the term "forcible felony." Allegations of ineffective assistance of counsel are reviewed pursuant to the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Cathey*, 2012 IL 111746, ¶ 23. For a claim of ineffective assistance of counsel, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To prevail on an ineffective-assistance-of-counsel claim, a defendant must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice. *Id.* at 687-88.

¶ 49    "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). The defendant's failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697. Accordingly, it is not necessary to first evaluate whether counsel's performance was deficient if a defendant is unable to show sufficient prejudice. *Id.*

¶ 50    With respect to the prejudice prong, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Errors by counsel "come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." *Id.* at 693. "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's

15

performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). Rather, "*Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id.* Like the matter before us, when "a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

¶ 51 Additionally, *Strickland* requires the defendant to "affirmatively prove" that prejudice resulted from counsel's errors. *Id.* at 693. "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81.

¶ 52 We review a claim of ineffective assistance of counsel *de novo*. *People v. Hale*, 2013 IL 113140, ¶ 15. On appeal, the defendant contends that there was a reasonable probability that the outcome of his trial would have been different if defense counsel had not stipulated to the term "forcible felony." The defendant argues that his case lacked extrinsic evidence and "essentially involved a credibility contest between [Jerry] and [Jakob] on one hand, and [the defendant] and his witness [Lenoir] on the other." Following a review of the record, including the evidence at trial, we disagree.

¶ 53 Here, by stipulating to the defendant's status as a felon, although erroneously including "forcible" in the stipulation, the parties shifted the focus of the trial away from this element of the offense and instead focused the trial on the possession element of the offense. The parties argued before the jury that the only issue at trial was whether the defendant possessed the firearm. Consequently, the defendant's claim that he was prejudiced by stipulating to his status as a "forcible felon" is merely speculative, as his status was not at issue during trial.

16

¶ 54    Further, the evidence regarding the element of possession, which was the issue at trial, supports the jury's finding of guilt and the result at trial. The evidence at trial shows that the defendant owned the vehicle from which the firearm was taken, and he had possessed the vehicle for at least a month before Holley retrieved the firearm. In addition, the defendant was the driver of the vehicle, and no other occupants were present at the time the firearm was discovered hidden in the interior panel of the driver's side door.

¶ 55    Holley testified that he pulled the defendant over for a traffic violation. Upon approaching the vehicle, Holley initially observed cannabis debris in plain view and brought the defendant's attention to it. Holley requested that the defendant relocate the traffic stop to a parking lot to avoid obstructing traffic. Holley described the defendant's behavior at this time as "pretty normal." Holley testified that the defendant was "very compliant" with his request. Upon relocating and reapproaching the vehicle, Holley testified he requested the defendant to exit the vehicle. The defendant complied, and it was at this time when Holley observed a large hunting knife in the map sleeve of the driver's door. Again, Holley testified he "brought light of the knife" to the defendant's attention and the defendant stated, "he'd been shot before and didn't want to get shot again." Holley testified he thought the statement was rather unusual, as a knife would offer little protection against someone with a gun. Holley instructed the defendant to sit in his squad car. As the defendant approached the squad car, he asked Holley if he was going to search the vehicle. When Holley responded in the affirmative, the defendant began sprinting away from the traffic stop and fled for approximately 45 minutes. See *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 18 (defendant's attempt to flee supported the "reasonable inference" that he had knowledge of the contraband); see also *People v. Davis*, 2023 IL App (1st) 220231, ¶ 42 (defendant's flight from police circumstantially indicates consciousness of guilt). We note that the defendant had several

17

opportunities to flee the traffic stop, *e.g.*, when relocating the traffic stop to an adjacent parking lot and upon initially exiting the vehicle. We find it significant that the defendant did not flee until Holley indicated that he would be conducting a full search of the vehicle, after he had already discovered and "brought light of" the cannabis debris and hunting knife. The defendant's flight, at this point in time, indicates additional contraband in the vehicle. Holley testified that "[t]here wasn't much in the vehicle," and no additional cannabis or drugs were located. Holley testified he eventually noticed the driver's armrest was loose and discovered a firearm hidden in the interior panel of the driver's side door.

¶ 56      Both Jakob and his grandfather, Jerry, testified at trial that they were unaware of any issues with the driver's side door at the time of the vehicle's sale. They also testified that People's Exhibit No. 8 did not accurately represent the condition of the vehicle when it was sold. Additionally, both Jerry and Jakob testified that they had never owned a gun and had not seen the firearm that was recovered from the defendant's vehicle, which was depicted in People's Exhibit No. 9, prior to the defendant's trial.

¶ 57      Testimony from the defendant's sole witness corroborates the testimony of Jerry and Jakob. Lenoir testified that the driver's side armrest did not move and showed no signs of being tampered with. During cross-examination, Lenoir recalled being a passenger in the vehicle on the day of the defendant's arrest, as the defendant had dropped her off at work. Lenoir's testimony indicates that the defendant was the only individual with access to the side of the vehicle where the firearm was found on the day of the defendant's arrest. Furthermore, both parties on appeal noted in their briefs that Lenoir confirmed she did not notice anything unusual with the driver's side armrest on the day of the defendant's arrest. Equally important, Lenoir stated that she was unaware if the armrest had ever been removed or if it could be easily removed, as she had never attempted to do so. Nor

18

had she ever attempted to investigate the driver's side door, as the noises it made did not seem suspicious to her. Additionally, we emphasize that Lenoir testified the vehicle's interior was cleaned on the day of its purchase; however, she maintained that she was unaware of anything unusual with the driver's side armrest.

¶ 58    Therefore, we conclude that the defendant has not affirmatively proven that prejudice resulted from defense counsel stipulating to the term "forcible felony." Since defendant cannot show that, but for defense counsel stipulating to the term "forcible felony," there is a reasonable probability the trial result would have been different, we conclude that he cannot prevail on a claim of ineffective assistance of counsel.

¶ 59                                    III. CONLCUSION

¶ 60    For the foregoing reasons, we affirm the defendant's conviction.


¶ 61    Affirmed.